# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9311 | **DATE** | 12/15/2004 |
| **CASE TITLE** | Sompo Japan Insurance, Inc. vs. Nippon Cargo Airlines, Co., Inc., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, plaintiff's motion for summary judgment [#68] is granted. Motion of defendant Nippon Cargo Airlines, Co., Inc. for summary judgment [#72] is denied. Judgment is entered in favor of the plaintiff in the amount of $76,923.03. Case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 21 2004 | 85 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | FILED | JXM | |
| ✓ | Mail AO 450 form. | RECEIVED - FDA | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 12/15/2004 | |
| MD | courtroom deputy's initials | 04 DEC 21 AM 8:13 | date mailed notice | |
| | | CLERK U.S. DISTRICT COURT | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SOMPO JAPAN INSURANCE INC. as
Subrogee of HITACHI DATA SYSTEMS
CORPORATION,

       Plaintiff,

       v.

NIPPON CARGO AIRLINES, CO., LTD.,
a Foreign Corporation, YUSEN AIR &
SEA SERVICE CO., LTD., a Foreign
Corporation, YUSEN AIR & SEA
SERVICE (U.S.A.) INCORPORATED, a
New York Corporation, and PACE AIR
FREIGHT, a Foreign Corporation,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**No. 02 C 9311**
**Judge Joan H. Lefkow**

DOCKETED
DEC 2 0 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sompo Japan Insurance ("Sompo"), filed this suit against defendants, Nippon

Cargo Airlines Co. ("NCA"), Yusen Air & Sea Service Co., Ltd. and Yusen Air & Sea Service

(U.S.A.) Incorporated ("Yusen"), and Pace Air Freight ("Pace"), seeking recovery under the

Warsaw Convention for damage allegedly sustained to cargo in transit from Tokyo, Japan, to

Plainfield, Indiana. Sompo has settled its claims against Yusen and Pace, leaving only NCA as a

defendant. Before the court are cross-motions for summary judgment. For the reasons stated

below, Sompo's motion is granted and NCA's motion is denied.



## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS

Hitachi Data System Corporation ("HDS") configures, markets, and sells computer data equipment built on Hitachi, Ltd. hardware for large-scale computer systems. HDS is a wholly owned subsidiary of Hitachi, Ltd., a Japanese corporation headquartered in Tokyo, Japan. (Pl. L.R. 56.1 ¶ 1.) In December, 2000, HDS ordered a large quantity of computer equipment (the "cargo") from Hitachi, Ltd. HDS, through its usual freight forwarder, Hitachi Transportation System, Ltd. ("HTS"), booked the cargo with Yusen for air carriage from Tokyo to Chicago,

Illinois. (*Id.* ¶ 8-9.) Yusen in turn booked the cargo with NCA for air carriage from Tokyo to Chicago. (*Id.* ¶ 10.) HDS separately retained Pace, an interstate motor carrier, for subsequent transportation of the cargo from Chicago's O'Hare International Airport ("O'Hare") to HDS's distribution center in Plainfield, Indiana. (*Id.* ¶ 5.) At some point during the course of its journey from Tokyo to Plainfield, the cargo was damaged. The parties dispute how this happened.

It is uncontested that when Yusen received the cargo in Tokyo, it issued house air waybills ("hawbs") that contained no exception as to the apparent good order and condition of the cargo. (*Id.* ¶ 9.) When NCA received the cargo from Yusen in Tokyo, it issued a master air waybill ("mawb"), which also contained no exception to the apparent good order and condition of the cargo. (*Id.* ¶ 10.)

In Tokyo, someone[1] prepared the cargo for shipment by placing the goods on airline pallets and secured the cargo to the pallets by cargo nets. An airline pallet is designed to be rolled aboard a carrying aircraft which is fitted with rollers embedded in the floor or deck of the aircraft. Similarly, the loaded pallet can subsequently be rolled into specially equipped trucks with rollers embedded in the floors of the truck trailers. (*Id.* ¶ 11.) NCA carried the cargo from Tokyo to Chicago on December 28, 2000. Once in Chicago, someone[2] rolled the palletized cargo off the carrying aircraft and rolled it into the NCA cargo facility at O'Hare. (*Id.* ¶ 12.)

On December 28, 2000, a company called Hudson General LLC performed ground handling services for NCA at NCA's cargo facility at O'Hare. Donald Taylor ("Taylor") was a

---

[1]Sompo states that "Yusen and/or NCA made up the goods for shipment." (Pl. L.R. 56.1 ¶ 11.) NCA disputes this allegation, correctly pointing out that the statement is not supported by the record. While the court fails to see how this fact is material, the court accepts Sompo's objection, but, taking judicial notice of the fact that the cargo did not prepare itself for shipment, assumes that "someone" did in fact prepare the cargo for shipment.

[2]*See* fn. 1.

ground handling agent assigned by Hudson General to perform ground handling services for NCA at the facility that evening.[3] (Def. Add'l Facts ¶ 35.) As a ground handling agent, one of Taylor's responsibilities was to move cargo from the NCA warehouse to the NCA loading dock and to load that cargo into the various tractor trailers that arrived at the NCA facility to pick up cargo. Taylor and other NCA employees would move these pallets through the NCA facility to the loading dock using NCA's mechanized roller system and, if the cargo was correct and in apparent good order and condition to the satisfaction of the truck driver picking up the cargo, push these pallets into the trailers, which were equipped with retractable roller systems embedded in their floors. (Def. Add'l Facts ¶ 36-37.)

Before loading the cargo into a trailer, the ground handling agent was responsible for filling out a "unit load device receipt ("ULD receipt") with the pallet number of the loaded cargo, the time of delivery, and a notation any damage to the cargo ("ULD receipt"). (Causevic Dep., at 79:3-10, 83: 22-84:1; Swinehart Dep., at 53:7-10.) When the ground handling agent finished loading the cargo and completing ULD receipts for each item loaded, the agent was to give the ULD receipt to the driver for his signature. (Causevic Dep., at 81:4-13.) The ULD receipt was then time stamped. (Swinehart Dep., at 53:10.) According to Leland Swinehart, Deputy Supervisor for NCA, a driver was required to sign the ULD receipt before he was allowed to leave with the cargo. (Swinehart Dep., at 54:9-16.) According to Fikret Causevic ("Causevic"), a NCA freight service supervisor, the ULD receipt is "the proof – that's the contract between us

---

[3] Sompo disputes this fact, arguing that the affidavit of Donald Taylor, to which NCA cites in support of this statement, is inadmissible. The court, however, denied Sompo's motion to strike Taylor's affidavit. Because Sompo fails support its denial by any citation to the record, the court deems this fact admitted.

and a customer for discharging ULDs [the pallets of cargo themselves] to the customer." (*Id.* ¶ 82: 16-18.)

On the evening of December 28, 2000, Pace sent two tractor trailer units with two drivers to the NCA facility at O'Hare. One of these tractor trailer units was driven by Pace driver Danny Thomas ("Thomas"). (Pl. L.R. 56.1 ¶ 14.) The trailer contained retractable rollers embedded in the floor and also had a set of latches designed to be raised from the floor of the trailer to prevent a loaded pallet from shifting forward or aft when the tractor trailer was in motion. (*Id.* ¶ 17.) NCA claims, however, that Thomas' trailer was not equipped with latches at the rear of the trailer. (Def. Resp. ¶ 17; Def. L.R. 56.1 ¶ 58.)

Taylor was one of two ground handling agents assigned to load the cargo into Thomas' trailer. The cargo to be loaded consisted of five loaded airline pallets. (Def. Add'l Facts ¶ 43.) Someone opened the rear doors of Thomas' trailer, and Thomas then backed the trailer into one of the bays or doors of the NCA loading dock to receive his portion of the cargo. (Pl. L.R. 56.1 ¶ 15.) Thomas then left his tractor trailer and proceeded to the office portion of the NCA facility to obtain paperwork necessary for the transfer of the cargo. (*Id.* ¶ 16.)

At this point, the parties' respective versions of events part ways. According to Sompo, while Thomas was in the office, "loading personnel contracted by NCA" began to transfer loaded pallets of HDS's cargo into Thomas's trailer.[4] (*Id.* ¶ 16.) Sompo claims that the loading personnel rolled the first two pallets into the front of the trailer without incident. However, when

---

[4] NCA has a written policy requiring the driver of the tractor trailer to be physically present at all times that his truck is being loaded. (Pl. L.R. 56.1 ¶ 16.)

5

the loading personnel attempted to roll the third pallet into the truck, Sompo claims that it became "jammed." (Pl. L.R. 56.1 ¶ 18.)

Sompo claims that Thomas returned at this point and that he and the loading personnel attempted to "unjam" the third pallet, but were unable to do so. The individuals involved then determined that a forklift would be required to unjam the third pallet. However, the facility's roller system prevented access of a forklift to the trailer. Thus, the individuals involved decided to move the trailer to another loading door where a forklift could have access. (Pl. L.R. 56.1 ¶ 19.) Thomas testified that at this point he activated the device on his trailer that lowers the embedded rollers into the trailer floor so that the bottoms of the pallets rest on the floor. (*Id.* ¶ 20.) Thomas could not ascertain whether the floor latches had been raised, so as to lock pallets one and two into position, because the jammed third pallet blocked his access to the interior of the trailer. Thomas testified that he determined after the incident that the loading personnel had not activated the latches to secure the second pallet and that he latched the second pallet himself. (*Id.* ¶ 21.)

Sompo claims that neither Thomas nor any loading personnel attempted to secure the third pallet with ropes or straps before moving the tractor trailer. (*Id.* ¶ 22.) Nevertheless, Thomas proceeded to the tractor of the tractor trailer unit, started the engine, and pulled the unit ahead. When the unit had proceeded no more than one hundred feet up the ramp at the facility, Sompo claims that the third pallet fell out of the back of the trailer and landed on the concrete surface of the ramp four to five feet below at a ninety degree angle from its original position. (*Id.* ¶ 23.)

NCA disputes almost every aspect of Sompo's version of the events. First, NCA claims

that Thomas was present the entire time the pallets were being loaded into the trailer and inspected each pallet before it was loaded into the trailer. NCA also denies that any of the pallets became jammed, claiming instead that Taylor and his co-worker loaded all five pallets into the trailer without incident. (Def. Add'l Facts ¶ 44.) NCA claims that the fifth, not the third, pallet[5] fell from the back of the trailer when Thomas was driving away from the loading dock to enable him to close the rear trailer doors. (*Id.* ¶ 45.) NCA claims that the pallet fell from the trailer because Thomas failed to completely lower the trailer's embedded roller system. (*Id.* ¶ 46.)

After the pallet fell, NCA personnel, including Causevic, were called to the scene. Causevic observed the fallen pallet about fifty feet away from the loading door and the trailer from which the pallet had fallen about one hundred feet from the loading door. Causevic noticed that a second loaded pallet had shifted aft in the trailer and was extending out of the rear of the trailer about twenty inches. (Pl. L.R. 56.1 ¶ 24.) Causevic took photographs of the fallen pallet and of the trailer.[6] (Causevic Dep., at 18: 21-22.) Two forklifts then were used to manipulate the loaded pallet into its correct position so that it could be loaded into the trailer. Sompo claims that, in the course of this manipulation, the pallet fell off the prongs of the forklift and again hit the concrete surface of the ramp, but NCA denies this. (Pl. L.R. 56.1 ¶ 25 and Def. Resp.) The

---

[5]According to the Pace air cargo manifest, the damaged cargo was on pallet number PAG23225KZ. (Pl. Ex. 18.)

[6]According to NCA's policy, these photographs should have been placed in an investigative file and maintained for five years. (Causevic Dep., at 43:21-24.) However, NCA has been unable to locate the file or the photographs. (Stahlmann Dep., at 9:7-10:16.)

7

fallen pallet was eventually righted, and it and the pallet extending from the rear of the trailer were properly loaded onto Thomas' trailer.[7]

Shortly after the incident, Causevic created an "HIM Report" to record and report information he obtained about the incident based on his own observations and on information he gathered from NCA employees and/or NCA's ground handling agents that observed the incident. The HIM report contained the following statement: "REASON FOR ACCIDENT: DRIVER MOVE [sic] THE TRUCK BEFORE THAN [sic] ROLLERS WENT ALL THE WAY DOWN. ALSO THE TRAILOR [sic] DIN [sic] DID NOT HAVE LOCKS ON THE END OF THE BED." (Causevic Decl., Ex. A.)

After all five pallets were loaded into his trailer, Thomas transported them to HDS's distribution center in Plainfield, Indiana and tendered them to HDS on December 30, 2000. William Callaway, a material handler at the HDS facility, noted and photographed the damage to the cargo on the pallet in question.(Pl. L.R. 56.1 ¶ 27-28.) The pallet contained six "units." Robert Shaffer, HDS's systems configuration manager, performed an "electronic functionality test" on all six units. Though some of the units passed the test, Shaffer concluded that all six units were not fit for resale because the shock damage impaired the reliability of the units. (*Id.* ¶ 30.) John Peterson, HDS's Senior Director of Logistics, confirmed Shaffer's determination that the units were total losses. Peterson identified the packing and drop testing specifications for the cargo involved and concluded that the six units had been dropped and had thereby been subjected to forces in excess of those allowed by the packing specifications. HDS does not allow for the

---

[7] Sompo alleges that two more pallets were then loaded onto the trailer. (Pl. L.R. 56.1 ¶ 26.) However, this statement is not supported by the record. (*See* Causevic Dep., at 31:20-32:3.)

distribution of such damaged products, because it would run the risk of malfunctioning and causing the disruption or shut down of a customer's computer operations. HDS policy requires the destruction of such damaged products. (*Id.* ¶ 31.) The six units were subsequently destroyed by fragmentation. (*Id.* ¶ 32.) The six units had an FOB Japan cost to HDS of $271,304. (*Id.* ¶ 33.) The parties dispute the shipping charges attributable to the damaged cargo, and the court is unable to determine these charges from the record.

The six units weighed a combined total of 4917 lbs., or approximately 2232 kg. (Def. Ex. C.) The packing lists that accompanied the cargo indicate that the total gross weight of the cargo, including its packaging, was 2874 kg. (*See* Exs.7, 10.) Two smaller packages carried under the same air waybills contained appendages[8] for the six damaged units. These two packages weighed a total of 68 kg. Thus, the total weight of the damaged cargo and the smaller packages whose value was affected by the damage was 2942 kg. (Pl. L.R. 56.1 ¶ 34.)

On February 6, 2001, representatives of HTS, NCA, Pace, and Yusen met to discuss the incident. NCA employees Causevic, Ian Stahlmann, and Richard Stults were present. A memorandum produced as a result of the meeting provided the following account of the incident:

> Two other pallets were loaded before pallet number PAG 23295 KZ. Said damaged pallet was loaded onto truck but became stuck in the back of the trailer. KZ driver could not push the pallet into the third position due to being stuck. Pace driver pulled his truck away from the NCA dock without lowering his trailer roller system or securing the last pallet. Driver pulled approx. 100 feet away from NCA dock dropping HDS pure pallet number PAG 23295 KZ. At this time the driver saw the dropped pallet and stopped. The pure pallet that was loaded into the second position of this trailer was hanging out of the back of the trailer and the damaged pallet was on the ground. The actual airline pallet

---

[8]The packing list associated with the damaged cargo carried under house air waybill No. 4968-4222 references one set of appendages containing jumper connectors, screws, kick plates, and a driver. (Pl. Ex. 4, at 2.) The packing list associated with the damaged cargo carried under house air waybill No. 4968-4406 references an set of appendages containing similar items. (Pl. Ex. 10, at 2.)

was standing straight up and down. This happened due to driver not securing pure pallets into his trailer before moving truck / trailer from NCA dock.

(Pl. Resp. to Def. Add'l Facts, Ex. A.)

Sompo was the insurer of the damaged computer equipment, has paid HDS for its insured losses, and is now subrogated to the interests of HDS to the extent of that payment. (Pl. L.R. 56.1 ¶ 2.) On December 20, 2002, Sompo filed suit against NCA, Yusen, and Pace. Sompo then settled its claims against Pace for the sum of $100,000. (Def. L.R. 56.1 ¶ 49.) Sompo also settled its claims against Yusen for $8,500.[9] The court has dismissed Sompo's claims against Pace and Yusen. *See* Order of May 21, 2004.

## DISCUSSION

### A. Liability

The parties agree that this action is falls within the parameters of the Warsaw Convention ("the Convention"),[10] an international treaty governing liability that arises from "international transportation of persons, baggage, or goods performed by aircraft for hire." Conv. Art. 1(1). In its original version, Article 20(1) of the Convention provided an air carrier a complete defense to all claims for damage to "persons, baggage, or goods" if the carrier could prove "that he or his agents have taken all necessary measures to avoid the damage or that it was impossible for him

---

[9]NCA alleges that Sompo settled its claims with Yusen for $7,500, but fails to cite to evidence in the record supporting this figure, and Sompo denies it. The court can find no evidence in the record identifying the amount for which Sompo settled its claims with Yusen. However, Sompo states in its response to NCA's motion for summary judgment that Sompo recovered a total of $108,500 through the combined settlement agreements with Pace and Yusen. Thus, the court assumes that Sompo settled its claims with Yusen for $8,500.

[10]The formal title of the Convention is "The Convention for the Unification of Certain Rules Relating to International Transportation by Air." It was opened for signature on October 12, 1929, is reported at 49 Stat. 3000 and 137 L.N.T.S. 11 (1934), and is reprinted at 49 U.S.C.A. 40105, note. The Warsaw Convention entered into force in the United States on October 29, 1934, and in Japan on August 18, 1953.

or them to take such measures." This provision, however, was amended by the Montreal Protocol No. 4.[11] The Montreal Protocol deleted Article 20 of the original Convention in its entirety and substituted the following:

> In the carriage of passengers and baggage, and in the case of damage occasioned by delay in the carriage of cargo, the carrier shall not be liable if he proves that he and his servants and agents have taken all necessary measures to avoid the damages or that it was impossible for them to take such measures.

This amendment abolishes the defense of due care to claims for cargo damage not occasioned by delay. Now, a carrier is liable for damage to cargo "upon condition only that the occurrence which caused the damage so sustained took place during carriage by air." Conv. Art. 18(2). Article 18(4) defines the last phrase, "during carriage by air," as

> . . . the period during which the baggage or cargo is in the charge of the carrier, whether in an airport or on board an aircraft, or, in the case of a landing outside an airport, in any place whatsoever.

Sompo argues that it is entitled to summary judgment because there is no dispute that the damage sustained by the cargo occurred "during the carriage by air," that is, while the damaged cargo was "in the charge of" NCA. NCA argues that the cargo was not damaged during carriage by air because the delivery of the cargo was complete the moment all five pallets were loaded onto the trailer. While the court must accept NCA's allegation that all five pallets had been loaded onto the trailer before the damage occurred, this does not mean that the delivery was complete and that the cargo was no longer in the charge of NCA. "[T]he intention of the parties

---

[11]The formal title of the protocol is "Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Transportation by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at the Hague on 28 September 1955." It was opened for signature on September 25, 1975, and entered into force in the United States on March 4, 1999. It is reprinted in S. Exec. Rep. No. 105-20, at 21-32 (1998). A combined version of the Convention and the Protocol may be found in 7 Saul Sorkin, *Goods in Transit*, Appendix G-4.

defines what constitutes the scope of delivery. Subject to the intent of the parties, delivery occurs when one party surrenders, and the other party accepts, possession, custody, and control of the goods involved." *Eddie Bauer, Inc.* v. *Focus Transp. Serv.*, 881 F. Supp. 1174, 1179 (N.D. Ill. 1995) (Carmack Amendment case involving interstate road transportation of cargo). The testimony of Causevic and Swinehart, both NCA employees, indicates that NCA did not surrender "possession, custody, and control" of any cargo until the driver receiving the cargo signed the ULD receipt. According to Swinehart, a driver was required to sign the ULD receipt before he was allowed to leave with the cargo. (Swinehart Dep., at 54:9-16.) According to Causevic, the ULD receipt is "the proof – that's the contract between us and a customer for discharging ULDs [the pallets of cargo themselves] to the customer." (Causevic Dep., at 82: 16-18.) NCA has failed to produce any ULD receipts for the damaged cargo, nor has it even claimed that Thomas signed the ULD receipt for the cargo before the incident occurred. Thus, there is no evidence in the record showing that the damage to the cargo occurred after NCA had surrendered "possession, custody, and control" of the cargo. Consequently, the court holds that the damage to the cargo occurred "during carriage by air" as defined by the Warsaw Convention and the Montreal Protocol.

The Convention provides carriers with limited number of defenses to cargo damage claims, only one of which is relevant here: a carrier can avoid liability, in whole or in part, if it can show that "the damage was caused by or contributed to by the negligence . . . of the person claiming compensation, or the person from whom he derives his rights." Convention Art. 21(2). NCA argues that Pace was acting as HDS's agent at the time the damage occurred and that there is a genuine issue of material fact as to whether Pace's driver caused or contributed to the

12

damage to the cargo. Sompo argues that Pace's driver was not acting as its agent and, even if he was, the contributory negligence defense provided by Article 21(2) only applies to damage caused by "the person claiming compensation, or the person from whom he derives his rights," not to the agents of those persons. The court need not decide the latter issue here, because there is no evidence that Pace's driver acted as an agent of HDS.

The Warsaw Convention does not contain a provision governing agency. In the absence of such a provision, the court applies the law that would govern in the absence of the Convention–here, the Illinois law of agency. *Zicherman* v. *Korean Air Lines Co., Ltd.*, 516 U.S. 217, 229 (1996). Under Illinois agency law, an agency relationship exists when the agent has "actual authority" to act on the principal's behalf, *Connick* v. *Suzuki*, 675 N.E. 2d 584, 592 (1996), or when the agent acts with the "apparent authority" of the principal. *Wargel* v. *First Nat'l Bank*, 460 N.E.2d 331, 335 (Ill. App. 5th Dist. 1984). The test of actual agency is "whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationship of the principal. Principal among these is the right to control the manner in which the work is done." *Chemtool, Inc.* v. *Lubrication Tech., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998). "An apparent agent is one who, whether authorized or not, reasonably appears to third persons to be authorized to act as the agent for another person, as the result of the acts of that other person." *Id.* at 745. Only the words and conduct of the alleged principal, not the alleged agent, establish the authority of an agent. *First American Title Ins. Co.* v. *TCF Bank,*, 676 N.E.2d 1003, 1008 (1997).

NCA argues that Thomas, the Pace driver, was acting as an agent of HDS because 1) he had HDS's authority to present HDS's transportation documents to NCA and to obtain the

release of HDS's cargo from NCA; 2) he had the responsibility of signing off on NCA's cargo on behalf of HDS; 3) he "would inspect the cargo and report any damage if the cargo was not in good order and condition at the time NCA tendered the cargo for delivery"; 4) he had the responsibility to handle and move the cargo so as to ensure that the cargo would be transported in a safe and secure manner; and 5) he was responsible for ensuring the security of the cargo after it was placed on his truck.[12] (Def. Resp., at 8.) None of this establishes that HDS had the "right to control the manner in which the work is done." *Chemtool*, 148 F.3d at 745. These facts only show that HDS hired Pace to deliver the cargo to HDS's distribution facility, an issue not in dispute, and that Thomas had the responsibility to ensure that this was done properly.[13] Thus, Thomas was not acting as HDS's agent when the cargo was damaged. *See e.g. Shoemaker* v. *Elmhurst-Chicago Stone Co., Inc.*, 652 N.E.2d 1037, 1041 (Ill. App. 1st Dist. 1994) (holding that a trucker was not a shipper's agent because shipper "did not have the right to control the manner in which [trucker] performed his job of hauling loads. [Trucker's] weighing the truck and assisting or overseeing the loading of the truck were preliminary tasks necessary before the driver could begin to perform his job. [Shipper] instructing [Trucker] where he should deliver the load did not control the manner in which the job was done but rather specified the particular hauling task for which [Trucker] was hired. [Shipper] did not control [Trucker's] driving or other conduct in hauling the load.").

---

[12]NCA argues that HDS employed a representative named "Bob" assigned to the NCA facility to oversee and supervise the handling and pick-up of its cargo shipments. (*See* Def. L.R. 56.1 ¶ 42.) However, the evidence shows that "Bob" was in fact an employee of HTS, not HDS. (Stahlmann Dep., at 30:22-24.)

[13]Indeed, according to NCA's argument, NCA was itself an agent of HDS. NCA was responsible transporting HDS's cargo in a safe and secure manner, inspecting the cargo for damage, and releasing the cargo to Pace.

## B. Limitation of Liability

Under the Convention and the Montreal Protocol, a carrier's liability is limited to "17 Special Drawing Rights[14] per kilogramme." Conv. Art. 22(2). Sompo claims that the total weight of the shipment, for purposes of computing NCA's liability, was 2942 kg. This number is based on the gross weight of the damaged cargo as identified in the packing lists that accompanied the cargo (2874 kg), plus the weight of the two smaller packages carried under the same air waybills which contained parts for the six damaged units (68 kg). NCA claims that its liability should be calculated based on the weight of the damaged items as specified in HDS's "technical evaluation" of the damaged items (2232.2 kg). NCA also argues that the 68 kg for the "appendages" should not be included in the total weight of the damaged cargo, because Sompo fails to offer an explanation of how, why, and to what extent the value of these undamaged items was affected by the damage to the cargo.

Article 22(2)(c) of the Convention provides that

the weight to be taken into consideration in determining the amount to which the carrier's liability is limited shall be only the total weight of the package or packages concerned. Nevertheless, when the loss, damage or delay of a part of the registered baggage or cargo, or of an object contained therein, affect the value of other packages covered by . . . the same air waybill, the total weight of such package or packages shall also be taken into consideration in determining the limit of liability.

According to this language, the weight to be considered in determining NCA's liability is the "total weight of the package or packages concerned." NCA's suggestion that the court should rely on the weight specified in HDS's "technical evaluation" of the damaged items is

---

[14] A "Special Drawing Right" ("SDR") is an artificial currency, the value of which is established by a "basket" of currencies (the U.S. dollar, the euro, the Japanese yen, and the British pound). The value of an SDR in U.S. dollars is published daily on the website of the International Monetary Fund. According to Article 22(6) of the Convention, the value of an SDR in national currency is to be determined "at the date of judgment."

unconvincing. The Convention does not state that relevant weight is the weight of the items damaged, but rather the weight of the "package or packages." This weight is clearly identified in the transportation documents. The packing lists for the cargo identify a gross weight and a net weight for each "package," identified by serial number. (*See* Def. Exs. 4, 7, 10.) Pace's air cargo manifest lists the following serial numbers for the damaged packages: 11508, 60075, 60080, 60078, 60081, and 30922. (*See* Def. Ex. 18.) The combined gross weight for these packages is 2874 kg. The combined net weight for these packages is 2529 kg. Because the Convention provides for calculation of liability based on "total weight," the court holds that the relevant weight is the gross weight.[15]

NCA's second argument--that the weight of the appendages should not be included--is also unconvincing. Sompo has presented evidence that the appendages were rendered useless by the damage to the equipment to which they were to be appended. (*See* Prince Aff. ¶ 20; Def. Ex. 4, at 2; Def. Ex. 10, at 2.) NCA denies that the appendages were rendered useless, but fails to cite to any evidence in the record to support its denial, resulting in the fact being admitted. *See Doe* v. *Templeton*, 2004 WL 1882436, at *2 (N.D. Ill. Aug. 6, 2004) ("Failure to cite to the record . . . results in the fact being admitted."). Thus, the weight of the appendages "shall also be taken into consideration in determining the limit of liability."

The total weight of the shipment, for purposes of computing NCA's liability, was 2942 kg. The current value of an SDR (as of December 10, 2004, the date of this judgment) is $1.53803. NCA's liability under the Convention, then, is limited to 17 x $1.53803 per kilogram, or $2640.79751 per kilogram. Thus, NCA's liability is limited to $76,923.03.

---

[15]Webster defines "gross" as "total." WEBSTER'S II NEW COLLEGE DICTIONARY 491 (1995).

## C. Setoff

Sompo settled its claims against Pace and Yusen for $108,500. In its motion for summary judgment, NCA argues that it is entitled to a setoff of this amount. The question is what the settlement amount should be setoff against. NCA claims that the $108,500 settlement should be setoff against its limited liability of $76,923.03, thus reducing NCA's liability to $0. Sompo argues that, if NCA is entitled to a setoff, it should be deducted from Sompo's total damages, which were at least $271,304[16], leaving NCA responsible for the full amount of its limited liability.

NCA's argument is based on the language of the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/2(c) ("Contribution Act"), which provides that "[w]hen a release . . . is given in good faith to one or more persons liable in tort arising out of the same injury . . . it does not discharge any of the other tortfeasors from liability from the injury . . . but it reduces the recovery on any claim against the others to the extent of any amount stated in the release . . . or in the amount of the consideration actually paid for it, whichever is greater." NCA argues that Sompo's "recovery" is limited to $76,923.03, and that this is the amount from which the setoff should be deducted. NCA cites no caselaw in support of this argument, relying instead on what it calls the "clear statutory language." But the meaning of "recovery" in the statute is by no means clear. "Recovery" means the "amount finally collected" by a plaintiff. Black's Law Dictionary 1276 (6th Ed. 1990). If the setoff were to be deducted from the "amount finally collected" by a plaintiff, however, the latter would no longer be the amount "finally collected." Applying the "plain meaning" leads to an absurd result.

---

[16]The parties do not dispute that the F.O.B. value of the damaged cargo was $271,304.

17

NCA's argues that the Contribution Act cannot be reasonably interpreted to mean that a settlement "reduces the total amount of *damages claimed* by the plaintiff to the extent of any amount paid in settlement." This is, however, precisely the language the Illinois Supreme Court used in *Hentze* v. *Unverfehrt*, 604 N.E.2d 536, 541 (1992), a case cited by NCA, to explain the setoff provision: "The underlying current behind [the setoff provision] . . . is that a plaintiff's *claimed damages* are to be reduced by any payments he has received in compensation for the same harm or injury." *Hentze* v. *Unverfehrt*, 604 N.E.2d 536, 541 (1992) (emphasis added). This interpretation of the provision is fully consistent with the purpose of the setoff provision. Illinois courts have repeatedly emphasized that purpose of the setoff provision is to prevent "double recovery" by a plaintiff. *See Eberle* v. *Brenner*, 505 N.E.2d 691, 702 (1987) ("An injured person is entitled to one full compensation for his injuries, and double recovery for the same injury is against public policy."); *Pasquale* v. *Speed Products Engineering*, 654 N.E.2d 1365, 1381-82 (1995)(Contribution Act's setoff provision "reflects the long-recognized principle in Illinois that a plaintiff shall have only one satisfaction for an injury. A double recovery is a result which is condemned and is exactly what section 2(c) of the Contribution Act was intended to prevent."); *Kravick* v. *Golub & Co., Inc.*, 676 N.E.2d 668, 674 (Ill. App. 1st Dist. 1996)(The Contribution Act "codifies the hoary tenet that a plaintiff may have only one satisfaction for an injury . . . ."); *Evans* v. *Tabernacle No. 1 God's Church of Holiness in Christ*, 669 N.E.2d 697, 702-03 (Ill. App. 1st Dist. 1996) (The Contribution Act's setoff provision "condemns double recovery and reflects long-recognized principle in Illinois that plaintiff shall have only one satisfaction for injury."). In all these cases, "double recovery" means that the plaintiff would recover more than "one full compensation for his injuries."

18

In the instant case, there is no possibility that Sompo will recover more than "one full compensation for its injuries." Sompo's total damages are at least $271,304. It received $108,500 in its settlements with Pace and Yusen, leaving $162,804 in outstanding damages. The Contribution Act only dictates that Sompo cannot "recover" more than this amount from NCA. Given that NCA's liability is limited to $76,923.03, Sompo will not recover even one full compensation for its injuries, much less "double recovery." Thus, the court denies NCA's motion.

## CONCLUSION

Sompo's motion for summary judgment is granted [#68]. NCA's motion for summary judgment is denied [#72]. The clerk is instructed to enter judgment in favor of the plaintiff in the amount of $76,923.03. Case is terminated.

ENTER: *Joan H. Lefkow*

JOAN HUMPHREY LEFKOW
United States District Judge

Dated: December 15, 2004

19