UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SOMPO JAPAN INSURANCE INC. as )
Subrogee of HITACHI DATA SYSTEMS )
CORPORATION, )
)
      Plaintiff, )
)
      v. )   No. 02 C 9311
)   Judge Joan H. Lefkow
NIPPON CARGO AIRLINES, CO., LTD., )
a Foreign Corporation, )
)
      Defendant. )

## MEMORANDUM OPINION AND ORDER

This case arises out of the shipment of a pallet of computer subsystems ("the cargo") that were damaged on the premises of a Nippon Cargo Airlines ("NCA") loading facility at O'Hare International Airport ("O'Hare"). Plaintiff, Sompo Japan Insurance Inc. ("Sompo"), as subrogee of Hitachi Data Systems Corporation ("HDS"), alleges that the damage sustained by the cargo occurred "during the carriage by air," that is, while the cargo was "in the charge of" defendant NCA. The court has jurisdiction under 28 U.S.C. § 1331. The issues of law were resolved by this court's ruling on Sompo's motion for summary judgment. The issues of fact were tried to the court on April 5, 2006.[1]

Based on the evidence received, including the parties' statement of uncontested facts, the exhibits received in evidence, the testimony of the witnesses, the court having weighed the

---

[1] On December 20, 2002, Sompo filed suit against NCA, Yusen Air & Sea Service Co., Ltd ("Yusen"), and Pace Air Freight ("Pace"). Sompo then settled its claims against Pace for the sum of $100,000. Sompo also settled its claim against Yusen for $8,500. The court dismissed Pace and Yusen as defendants on May 24, 2004 [Docket No. 71].

evidence and the credibility of the witnesses, enters the following findings of fact and conclusions of law.

## Undisputed Facts

1. HDS is a Delaware Corporation whose world headquarters is in Santa Clara, California. HDS builds, configures, tests, markets, and sells computer data storage equipment. HDS operates a large distribution center for these purpose at Plainfield, Indiana, near Indianapolis. HDS is a wholly-owned subsidiary of Hitachi, Ltd., a Japanese corporation headquartered in Tokyo. Hitachi, Ltd., was the manufacturer of the cargo involved in this litigation.

2. Sompo, the insurer of the cargo, has paid HDS its claimed insured loss, and is subrogated to the interests of HDS to the extent of that payment.

3. NCA is an international carrier. It was the actual or direct air carrier of the cargo from Tokyo to Chicago, Illinois.

4. Yusen is an air cargo forwarder and was the indirect air carrier of the cargo from Tokyo to Chicago.

5. Pace is an interstate motor carrier and was the motor carrier of the cargo from the NCA facility at O'Hare to the HDS distribution center in Plainfield.

6. In December 2000, HDS ordered a large quantity of computer equipment from Hitachi, Ltd.

7. HDS, through its usual freight forwarder, Hitachi Transportation System, Ltd., booked the cargo with Yusen for air carriage from Tokyo to Chicago.

8. Yusen in turn booked the cargo with NCA for air carriage from Tokyo to Chicago.

9. HDS separately retained Pace for subsequent transportation of the cargo from O'Hare to HDS's distribution center in Plainfield.

10. Yusen received the cargo in Tokyo and issued "house" air waybills ("hawbs") for the transportation. These hawbs were "clean," meaning that they contained no exception for the apparent good order and condition of the cargo.

11. Since Yusen does not itself operate aircraft on the Tokyo-Chicago route, it booked the cargo for carriage with NCA. NCA received the cargo in Tokyo and issued a master air waybill ("mawb") for the transportation, which was clean.

12. In Tokyo, Yusen or NCA made up the cargo for shipment by placing the individual pieces of cargo on airline pallets and by securing the individual pieces of cargo to those pallets with cargo nets.

13. An airline pallet, 8 feet by 10 feet (sometimes called a cookie sheet), is designed to be rolled aboard a carrying aircraft which is fitted with rollers embedded in the floor or deck of the aircraft. Similarly, the loaded pallet can subsequently be rolled into specially equipped trucks with rollers embedded in the floors of the truck trailers.

14. On December 28, 2000, NCA carried the palletized cargo by air from Tokyo to Chicago.

15. At O'Hare, the palletized cargo was rolled off the carrying aircraft, transported by "tug" to the NCA cargo terminal, and rolled into that facility.

16. Pace, which had been retained to transport the still-palletized cargo from O'Hare to the HDS facility in Plainfield, sent two tractor-trailers to the NCA terminal at O'Hare on the night of December 28, 2000.

17. Danny Thomas ("Thomas") drove one of the tractor-trailers. Thomas's trailer was 53 feet long and contained retractable rollers embedded in the floor and a set of latches or locks

3

designed to be raised from the floor of the trailer to prevent a loaded pallet from shifting forward or aft when the tractor-trailer was in motion.

18. When Thomas arrived at the NCA terminal, he opened the doors to the trailer and then backed the tractor-trailer into one of the loading bays of the NCA loading dock to receive his portion of the HDS cargo.

19. This loading bay was fitted with a roller system designed to transfer loaded pallets from their storage positions inside the terminal into the type of roller-equipped trailer driven by Thomas.

20. Donald Taylor ("Taylor"), a Hudson General LLC ("Hudson") employee, was the lead ground handling agent ("dock worker") assigned to perform ground handling services for NCA at the NCA facility on December 28, 2000. As a dock worker, one of Taylor's responsibilities was to move cargo from the NCA warehouse to the NCA loading dock and to load that cargo into the various tractor-trailers that arrived at the NCA facility to pick-up cargo.

21. Ordinarily, Taylor and other NCA employees would move these pallets through the NCA facility to the loading dock using NCA's mechanized roller system and, if the cargo was in apparent good order and condition to the satisfaction of the truck driver picking up the cargo, push these pallets into the roller-equipped trailers.

22. As standard practice at the NCA facility, the dock worker was also responsible for filling out a unit load device receipt ("ULD receipt") with the pallet number of the loaded cargo, the time of delivery, and a notation of any damage to the cargo before loading the cargo into a trailer. When the dock worker finished loading the cargo and completing ULD receipts for each item loaded, the agent was to give the ULD receipt to the driver for his signature.

23. Thomas signed the ULD receipts for seven pallets, indicating that all of the ULDs were received in serviceable condition. The damaged pallet, PAG23225-KZ, is the third on a list

of three items on a ULD receipt. The notation "SER" is written diagonally across the three lines, indicating one notation for all three pallets on the receipt.

24. The precise times these documents were prepared and signed is unknown.

25. After the incident at issue, an individual identified as Zumreta Causevic and another freight services supervisor, Leland Swinehart, prepared a Cargo Damage Report, bearing a time notation of 10:35 p.m. That document noted that damage occurred upon delivery and was due to improper storage in the truck.

## Disputed Facts

### A.. Thomas's Testimony

Thomas testified that after he positioned his tractor-trailer in one of the roller-equipped loading bays, he raised the rollers and proceeded to the NCA office to take care of the paperwork associated with the cargo. That paperwork included the preparation and issuance of cargo "pick lists" which identified the particular ULDs containing the cargo that Thomas was scheduled to pick-up.

At that location, the truck was on an incline so the rear of the trailer was positioned lower than the front and the truck.

When Thomas arrived at the NCA office, Miro Coric ("Coric"), the second driver sent by Pace that evening to pick-up and deliver HDS cargo to Plainfield, was already processing the paperwork for the entire freight. Thomas was scheduled to receive five pallets of HDS cargo, while Coric was scheduled to receive two.

After waiting 15 or 20 minutes for the paperwork to be completed, Thomas returned to the dock without it, expecting Coric to arrive with it shortly. Once there, Thomas saw three unidentified dock workers trying to move a heavy pallet which had become stuck or wedged into

5

the back of his trailer.[2] The pallet was partly in and partly out of the trailer. The supervisor on the dock instructed Thomas to move his tractor-trailer to a non-roller loading bay so that the dock workers could attempt to dislodge the third pallet with a forklift (a forklift could not be used on a roller bay).

Before moving his tractor-trailer, Thomas testified that he activated the device on his trailer that lowers the embedded rollers into the trailer floor. Thomas then got into his truck, started the engine, and pulled forward and away from the loading dock in order to maneuver the truck and trailer to the other loading bay.

After pulling somewhere between 30 and 50 feet from the loading dock, someone signaled for him to stop. When he got out of the truck he saw that the jammed pallet had fallen out of the back of the trailer and landed on the pavement, while the pallet loaded in the second position had slid forward, with the front edge of the pallet hanging out of the trailer. The fallen pallet, which had been in a horizontal position in the trailer, landed in a vertical position.

At that point, a number of warehouse workers, including Fikret Causevic, a freight services supervisor, came to the scene. A forklift arrived to attempt to move the fallen pallet but in the process caused the pallet to drop again. With a second forklift, the workers were able to lift the pallet and take it back to the loading dock. Meanwhile, Thomas raised the rollers and he and others pushed the second pallet back into the truck and locked it into place. Then Thomas moved the truck back to the loading dock.

---

[2]The weight of Thomas's testimony is that the third pallet became stuck. In a statement written and submitted to his supervisor Jim Anderson the day following the accident, however, Thomas reported that ground-handling personnel told him they had gotten three pallets stuck. He testified at trial that he had dictated the statement to his wife at the breakfast table while in a hurry to get to work, but in fact the third pallet was stuck and his earlier statement was incorrect. He could not explain his response to the dock worker, "I asked why, after the first one had gotten stuck, did they continue to load two more. They replied that they had decided to load them, then have me move to another dock where they could access my trailer with a forklift and use that to push the three stuck pallets forward. . . ." Pl. Exh.6 Although the literal reading is that he had been told three pallets had been stuck, he did not rely on misinformation as the explanation. In any event, only the stuck pallet could have been visible to him at the time.

6

Thomas observed NCA personnel reload the fallen pallet, as well as a fourth and fifth pallet.[3] His trailer now fully loaded, Thomas pulled the tractor-trailer forward approximately five to ten feet, closed and locked the trailer doors, and departed from NCA's facility.

Thomas believed that the third pallet fell because the dock workers failed to lock the number two pallet into place so that as the trailer began moving on an upward incline the second pallet slid and dislodged number three, causing it to fall.

On cross-examination, Thomas conceded that the width of the interior of the trailer was 98 inches, which would allow one inch of clearance on either side of the pallet.

He maintained that three or four men were able to push a 3-ton pallet uphill into the front of the trailer because of the roller system.

He insisted that the dock workers knew which cargo to load without the paperwork because they did the same thing every night.

He conceded that there was no damage notation on the ULD receipt that he took with him, even though he would normally insist that be done. He testified that he and Coric tried to make the notation on the delivery discharge order (a separate document from the ULD receipt) but "[NCA] wouldn't allow us to." Thomas testified that the ULD receipts were filled out before the incident happened.

## B. Causevic's testimony

According to Causevic, the loading procedure is for the driver to pull into the loading bay, then go to the office to get the pick list, which identifies what cargo is to be loaded onto the truck. The driver gives the pick list to the dock workers and that is how they know what to load.

---

[3] In his December 29 statement, Thomas maintained that he moved his truck into a non-roller loading bay following the accident where the fallen pallet was reloaded with a forklift, and then moved his truck back to the roller-equipped loading bay to receive the final two pallets.

Causevic inferred that Thomas must have been present while all the loading was being done because the driver delivers the pick lists which identify the items to be loaded.

When Causevic arrived at the scene he observed the fallen pallet approximately 50 feet from the loading dock and close to the trailer.[4] Another pallet was protruding one-to-two feet out of the trailer. Causevic supervised the use of forklifts to move the fallen pallet back to the original loading dock. Causevic denied that the fallen pallet was dropped during that procedure. A forklift was used to push the protruding pallet back into the trailer far enough to close the door and Thomas moved his truck back to a non-roller loading bay so a forklift could be used. From the loading dock a forklift was used to push the pallet that had been protruding further back into the trailer until it hit the pallet in front of it. That pallet stopped in the fourth position, leaving the fallen pallet to be moved into the fifth position. The dock workers made an effort to activate the floor locks for the pallet loaded in the fifth position. Those locks, however, were not working. As a consequence, delivery was tendered to Thomas without the fifth pallet having been secured.

Causevic testified that the notation of time on the ULD receipt could have been an estimated time for release of the cargo, or could have been the time the documents were prepared. He testified that the roller bays are equipped with a winch, normally used for removing cargo from a trailer, which could readily have pulled a stuck pallet from the trailer, had that actually occurred.

He testified that the driver would pull, at most, five feet away from the loading dock to close the doors before departure and it would be very unusual for a driver to pull out 50 feet.

---

[4]Causevic took photographs of the fallen pallet and of Thomas's trailer. According to NCA's policy, these photographs should have been placed in an investigative file and maintained for five years. NCA, however, has been unable to locate the file or the photographs.

8

C.  Taylor's testimony

Taylor, who was acting as "lead" for the loading dock workers, testified that he loaded all five pallets into the trailer before any pallet fell out, that the driver was present throughout the loading, and the driver signed for all the pallets before the pallet fell.[5] Taylor said that if a pallet had become stuck he would have used a winch to pull the pallet off, realign it, and then put it back into the trailer. Taylor did not see the pallet fall but he did see it after it fell. He observed the pallet in its normal horizontal position, bent, about 25-30 feet from the door.[6] The record is silent as to how long after the incident Taylor observed the fallen pallet. He testified that had the pallet been bent when it was loaded, the ULD receipt would have indicated damage. Taylor could not remember what happened regarding reloading the fallen pallet, although he was apparently involved.[7]

Taylor testified that he prepares the ULD receipts after the cargo is actually loaded. He obtains the identifying information from the pick slips that are handed to him by the driver.

## Evaluation of the Evidence

Because the court has determined that the case turns on whether the incident occurred during carriage by air, and that issue is determined by which party had possession, custody and control of the cargo when the pallet fell, the material issue of fact is whether NCA had delivered possession, custody and control of the cargo to Pace before the pallet fell. That issue turns on whether NCA was in the process of loading when the pallet fell or whether NCA had finished and

---

[5] Although Causevic testified that the locks at the end of the bed were inoperable, Taylor's testimony reflects nothing about missing or malfunctioning floor locks.

[6] This apparently means door of the loading dock, not door of the trailer.

[7] "I believe we took another two forklifts outside and I believe we tried to put it into the back of the truck, but I can't remember exactly what happened out there." Tr. at 151.

9

Pace's driver was on his way out of the facility when the pallet fell. The court concludes that the pallet fell during the process of loading the trailer.

According to Sompo, Taylor and the other dock workers began to load the trailer before Pace's driver Thomas returned from the office. Because the driver is the person who is in charge of the rollers and floor locks of the trailer bed, Thomas was supposed to be there, not to load but to make sure the pallets were properly loaded and locked into place. The dock workers loaded the second pallet but did not raise the locks. Because of delay in the office, by the time the third pallet was being loaded, the air had seeped out of the trailer's rollers, which impeded the ability of the third pallet to roll and it became wedged in the opening. At NCA's direction, Thomas undertook to move his truck to a non-roller bay in order to use a fork lift to dislodge the pallet. Although Thomas lowered the rollers, he did not know the second pallet had not been locked in. As the truck moved up the incline of the ramp, the second pallet rolled against the third and caused it to dislodge and fall.

According to NCA, the dock workers loaded all five pallets without incident and Thomas signed for the cargo and pulled away about 50 feet from the dock at which point the fifth pallet fell out. This happened because there was no operable floor lock on the end of the trailer and Thomas either forgot to lower or proceeded too far before lowering the rollers and/or forgot to secure the rear door. NCA surmises that Thomas must have put the truck into gear and popped the clutch, causing the vehicle to jump and the fifth pallet to fall out of the trailer.

Both versions are fraught with improbability, confirming the maxim that truth is stranger than fiction. If, as Thomas testified, the dock workers loaded this type of cargo every evening and were so familiar with it they did not even need pick lists, then surely they knew how to load it

properly. If the problem was, as Thomas testified, that air had seeped out of the roller system, one would expect Thomas to have attempted to raise the rollers before moving the truck, and failing that, Taylor would have used the available winch.

Further, Sompo's argument that the ULD receipts prepared at 11:00 demonstrate that the cargo was released after the pallet fell faces the difficulty a) that the receipts reflect the pallet as in serviceable condition, which was certainly not true at 11:00, and b) Thomas testified that they were prepared *before* the pallet fell. If the receipts were prepared before the pallets were actually loaded, as Thomas testified, they are irrelevant to determination of which pallet fell.[8] According to Causevic, the time notation could have been estimated, and in this instance the actual time must have been before the incident occurred, sometime before 9:35, as Taylor would not have noted serviceable cargo at 11:00. That the receipts were prepared after loading is consistent with Taylor's account of regular practice and consistent with NCA's version of events.

On the other hand, there is no corroborating evidence of inoperable locks at the end of the trailer bed, even though the trailer in use was identified in discovery. It is equally unlikely that an experienced driver such as Thomas would neglect to secure his load, or would secure his load 50 feet away from the dock when it was apparent that the last pallet was not locked in and he was proceeding up a steep hill. Witnesses and documents that might have resolved these fact issues were not produced.[9]

---

[8] If Thomas is correct that the dock workers loaded three pallets before the pick lists were delivered, then the receipts must have been prepared after the first three pallets were loaded.

[9] Perhaps for good reasons not conveyed to the court, Miro Coric, Leland Swinehart, and the other dock workers who loaded the cargo or who haled Thomas to stop after the pallet fell, were not called. In addition to the absence of documents that might have corroborated the condition of floor locks at the end of the trailer, the file prepared and photos taken at the time were inexplicably lost. A photo of the loading dock at 10:00 p.m. would have

11

On this record, Thomas's credibility is crucial. His trial testimony that the third pallet fell from his trailer is buttressed by the statement he dictated to his wife on the day after the accident, wherein Thomas asserted that only three pallets had been loaded on his truck at the time the accident occurred. At the time he dictated his account, Thomas had reason to believe there were multiple witnesses to the events and photos of the position of the pallets in his trailer following the accident. That those photographs ultimately disappeared and many of those witnesses were not brought forward is immaterial to his state of mind at that time. Then, Thomas would have had little reason to believe that a fabricated version of events would not be directly and conclusively refuted. Further, he could not have anticipated the issue that is before the court: whether the damage occurred during carriage by air. As such, his prior consistent statement is highly probative.

At the same time, to reject Thomas's testimony the court must infer that his story is a total fabrication. The witness's demeanor at trial belies that conclusion, in spite of some troubling inconsistencies in his testimony. Thomas's deposition was taken approximately two-and-one-half years after the incident and he testified more than a year and one-half after the deposition. Under these circumstances, complete consistency is both unlikely and perhaps even more suspect than a measure of inconsistency. Thomas may be assumed to have had a motive to protect himself, of course, such as to cast blame on the dock workers for improper loading rather than confess to lack of vigilance in monitoring and securing his cargo. But that could have been done without making

---

been helpful in assessing the credibility of witnesses.

up the improbable scenario to which he testified. For example, he could have merely blamed them for failure to secure the fourth and fifth pallets as they should have.

Although Thomas's contention that the dock supervisor instructed him to move his truck into a non-roller loading bay so they could use a forklift to dislodge the wedged pallet would appear unlikely in light of Causevic's and Taylor's testimony that NCA's roller system is equipped with a winch capable of dislodging cargo misloaded into a trailer, nevertheless, the court accepts the fact that a pallet did become stuck at the hands of NCA. If a winch was not used to dislodge it, then another technique must have been employed.[10] Counterintuitively, Taylor testified to remembering loading the pallets, a routine event, but could not remember anything in particular about the unusual event of using a forklift to lift and reload the fallen pallet. The court infers from this that Taylor had little or no present memory of events at the dock before the pallet fell.

NCA's other witness, Causevic, simply did not witness anything until after the pallet had fallen and he could only infer from circumstances and hearsay what had occurred. (He testified that Thomas did not talk about what had happened at the time but assured Causevic that his company had insurance; he learned about what had occurred from another supervisor name Leland Swinehart, who also did not witness the accident.) He was not the supervisor of the dock workers and was not in a position to know whether the regular procedures for loading and dealing with problems were or were not followed in this instance.

---

[10]Unfortunately, there was no testimony from NCA as to how the winch actually works, but the record contains no suggestion that it would have been inadequate to the task.

13

Moreover, Causevic testified that when he arrived at the scene of the accident, he observed the fallen pallet approximately 50 feet away from the loading bay. This fact is more consistent with Thomas's testimony that he was driving up the steep driveway to re-position his truck and trailer in a non-roller loading bay than, as NCA contends, departing the NCA facility altogether. Although either intention is possible, it seems more likely that if the fifth position pallet had fallen as Thomas was climbing an incline to leave the facility having failed to secure his load, the pallet would have rolled out quickly and only a few, not 50, feet away from the loading dock.

The court also finds implausible Causevic's testimony that the floor locks in the fifth position on Thomas's trailer were inoperable. As indicated earlier, there is no evidence that Thomas or any other Pace driver reported this fact to Pace, and there is no evidence that a repair was done. One could also wonder, if the floor locks were inoperable, why the dock workers would fail to lock the fourth and then load a fifth pallet into Thomas's trailer when Coric's trailer was scheduled for only two.[11]

Finally, the court finds incredible NCA's assertion that it was the fourth pallet that slid to the edge of Thomas's trailer. To accept that assertion, the court would have to infer that Thomas or the dock workers properly raised the floor locks for the first three pallets loaded onto Thomas's trailer, but then forgot to do so for the fourth, only to find the fifth inoperable, yet took no precaution to avoid the danger to be prevented by the locks.

---

[11]Thomas testified that the locks could not be used for the third pallet because the pallet was damaged. If the fifth pallet was the one damaged, then the locks, though operable, likely could not have been used when the reloading occurred. Nevertheless, NCA did not make this argument and rather chose a theory that, if true, could likely have been confirmed by documents. Although not decisive, the evidence on this fact does not help NCA.

14

## Damages

In a Memorandum Opinion and Order dated December 15, 2004, the court found that the liability of NCA is limited by the provisions of Article 22(2)(b) to the maximum sum of 17 Special Drawing Rights of the International Monetary Fund per kilogram of damaged cargo. The court further found that the weight to be taken into consideration for purposes of limitation of liability is "the total weight of the package or packages concerned" plus the weight of other packages covered by the same air waybill" whose value is affected by the physically damaged package(s), which, in this case, was 2942 kg. *See* Article 22(2)(c). The current value of an SDR (as of September 4, 2006, the date of this judgment) is $1.48860. NCA's liability under the Convention, then, is limited to 17 x $1.48613 per kilogram, or $25.3062 per kilogram. Thus, NCA's liability is limited to $74,450.84.

## Prejudgment Interest

In addition to damages under the affected weight standard, Sompo seeks prejudgment interest. The availability of prejudgment interest is governed by the Warsaw Convention, 1929, as Amended at The Hague, 1955 and by Protocol No. 4 of Montreal, 1975 ("Montreal Protocol No. 4").[12]

The Seventh Circuit has concluded that in cases governed by the original Warsaw Convention of 1929 ("the Convention"), prejudgment interest is subject to the conditions and limits imposed under the Convention's limitation of liability clause, Article 22. *Deere & Co.,* v.

---

[12]Montreal Protocol 4 To Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as Amended by the Protocol Done at the Hague on 28 September 1955, 2145 U.N.T.S. 36.

15

*Deutsche Lufthansa Aktiengesellschaft*, 855 F.2d 385, 392 (7th Cir. 1988). The Seventh Circuit reasoned that since "[p]rejudgment interest attempts to make a successful plaintiff whole by awarding him the time value of his money," "[i]t is an element of damages, which are explicitly limited by the Convention to a fixed, uniform and knowable level." *Id.* at 392.

Article 22 of the Convention was amended by the 1955 Hague Protocol[13], which added a new Article 22(4), which provides, in part, that "[t]he limits prescribed in this article shall not prevent the court from awarding, in accordance with its own law, in addition, the whole or part of the court costs and of the other expenses of the litigation incurred by the plaintiff." Hague Protocol, Article 22(d). Neither the text nor the drafting history of this amendment gives any indication that the drafters of the amendment sought to permit recovery of prejudgment interest in addition to damages limited by Article 22. *See Swiss Bank Corp. v. Brink's-MAT Ltd.*, [1986] 2 Lloyd's Rep. 79, 101 (Eng. C.A.) (observing that since Article 22 of the Hague Protocol had made explicit that attorney's fees and costs may be awarded in excess of the liability caps, the absence of similar language permitting prejudgment interest indicated that the award of such interest was not permissible). Likewise, Montreal Protocol No. 4[14], which did not modify in anyway the liability limitations set forth in Article 22(4) of the Hague Protocol, does not provide for recovery of prejudgment interest. Since neither the Hague Protocol, nor Montreal Protocol No. 4 amended Article 22 of the Convention to allow for an award of prejudgment interest separate from and not subject to the damage limitation, the Seventh Circuit's determination in *Deere & Co.* that

---

[13] Protocol to Amend the Convention for the Unification of Certain Rules relating to International Carriage by Air signed at Warsaw on 12 October 1929, Sept. 28, 1955, 478 U.N.T.S. 371.

[14] Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on 28 May 1999, S. Treaty Doc. No. 106-45.

prejudgment interest is subject to that liability limitation applies equally to claims governed by Montreal Protocol No. 4. 855 F.2d at 392. Accordingly, Sompo is not entitled to prejudgment interest.

## Conclusions of Fact and Law

In light of all the evidence, the court concludes that Sompo's version of the facts is more likely true than NCA's version of the facts and enters the following Conclusions of Fact and Law:

1. Taylor and the other dock workers began to load the trailer before Pace's driver Thomas returned from the office.

2. Because of delay in the office, by the time the third pallet was being loaded, the air had seeped out of the trailer's rollers, which impeded the ability of the third pallet to roll and it became wedged in the opening.

3. At NCA's direction, Thomas undertook to move his truck to a non-roller bay in order to use a fork lift to dislodge the pallet. As the truck moved up the incline of the ramp, approximately 50 feet from the loading bay, the second pallet rolled against the third and caused it to dislodge and fall.

4. The damage to the cargo occurred while the cargo was in the charge of NCA.

5. The damage occurred during carriage by air.

6. NCA is liable for the damage to the cargo.

7. Sompo is not entitled to prejudgment interest.

**ORDER**

Judgment will be entered in favor of Sompo. The parties are given until October 2, 2006 to submit a proposed judgment order, agreed to in form. If an agreed order is not submitted, the case will be called for status on October 3, 2006.

Entered: September 4, 2006

Joan Humphrey Lefkow
United States District Judge